IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BANK MIDWEST, A DIVISION OF NBH BANK**,<br><br>**Plaintiff,**<br><br>v.<br><br>**R.F. FISHER ELECTRIC COMPANY, LLC; R.F. FISHER HOLDINGS, INC.; AND G & G LEASING, LLC,**<br><br>**Defendants.** | Case No. 19-CV-2560-JAR-GEB |

## MEMORANDUM AND ORDER

Plaintiff Bank Midwest, a division of NBH Bank ("Bank Midwest"), filed suit against Defendants R.F. Fisher Electric Company, R.F. Fisher Holdings, and G & G Leasing (collectively "Defendants") due to Defendants' default on loans from Bank Midwest. Plaintiff seeks a $11,416,051.84 judgment. International Brotherhood of Electrical Workers Local 124 ("the Union") filed an Intervenor Complaint asserting several claims and seeking declaratory judgment on a claim that it has priority over $137,955.11 of Defendants' assets, which represents unpaid employee wages and benefits. This matter is now before the Court on Bank Midwest's and the Union's motions seeking a declaratory judgment as to which party has priority over $137,955.11 in Defendants' assets. For the reasons stated in detail below, the Court finds that Bank Midwest's liens have priority. Thus, the Court grants Bank Midwest's Declaratory Motion for Lien Priority, entitled "Brief in Support of Plaintiff's Lien Priority and in Opposition to Claim of Lien Priority Filed by International Brotherhood of Electrical Workers Local 124" (Doc. 51) and denies the Union's Motion for Declaratory Judgment, entitled "Intervenor Plaintiff's Brief in Support of Declaratory Relief" (Doc. 52).

**I.      Legal Standard**

Federal Rule of Civil Procedure 66 provides

> These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued.  But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule.  An action in which a receiver has been appointed may be dismissed only by court order.

This rule, however, "does not provide specific instructions to receivers on how to administer or manage the receivership estate."[1]  Instead, receivers are "to follow traditional equity practice or local rules (where they exist) for administrative matters like the procedure for disposing of or distributing assets."[2]  Furthermore, "[b]y statute, Congress has instructed federal receivers to manage receivership property according to the law of the state where the property is located."[3]

Bank Midwest and the Union both ask the Court to prioritize their claim to the assets held by the Receiver.  It is within the Court's discretion whether to exercise jurisdiction in a declaratory judgment action.[4]  In a declaratory action, the court can determine the priority of legal interests.[5]  A court must consider statutory language when determining whether the language creates a preference or lien and the priority of such preference or lien.[6]  The interpretation of a statute is a question of law.[7]

---

[1] *SEC v. Vescor Cap. Corp.*, 599 F.3d 1189, 1193 (10th Cir. 2010).

[2] *Id.*

[3] *Id.* at 1193–94 (noting that the "receiver must manage and operate the property 'in the same manner that the owner or possessor thereof would be bound to do' under applicable state law") (citing 28 U.S.C. § 959(b)).

[4] *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  The parties agree that the issue of the lien priority between Bank Midwest and the Union may be resolved in this declaratory judgment proceeding.

[5] *See Bank v. Parish*, 264 P.3d 491, 495 (Kan. App. 2011).

[6] *First Nat'l Bank of Med. Lodge v. Fam. Med. Clinic of Med. Lodge*, Kan. P.A., 798 P.2d 519 (Kan. Ct. App. 1990).

[7] *Finstad v. Washburn Univ.*, 845 P.2d 685, 690 (Kan. 1993).

**II.     Facts and Procedural Background**

Defendants are indebted to Plaintiff Bank Midwest under five Promissory Notes ("Notes") totaling approximately $9,631,976.03.  The Notes are secured by a series of Security Agreements that granted Bank Midwest liens on various assets.  Bank Midwest perfected its security interest in the collateral by filing UCC-1 Financing Statements with the Kansas Secretary of State.  Defendants subsequently defaulted on their obligations under the Notes and Security Agreements.

On May 15, 2019, Bank Midwest sent a Notice of Default to Defendants informing them of the defaults and reserving all rights under the Notes and Security Agreements.  As of the filing of this lawsuit, Defendants were indebted to the bank under the Notes for principal, interest, and other charges, as well as overdrawn on their account balances at Bank Midwest, for a total of $11,416,051.84.[8]

Defendant R.F. Fisher and the Union are signatories to successive collective bargaining agreements ("CBAs"), with the most recent CBA effective August 26, 2019 to August 30, 2020.  That CBA states that Local 124 is the sole and exclusive representative for all the employees covered by the CBA.  R.F. Fisher employed approximately 150 current and former Local 124 members.  According to the CBA, R.F. Fishers was to pay wages and fringe benefits as an hourly package.

On September 16, 2019, Bank Midwest filed this lawsuit seeking to enforce Defendants' obligations under the Notes and Security Agreements and requesting the appointment of a Receiver over Defendants' assets consisting of the collateral.  On that same day, and before the Court appointed a Receiver, Defendants ceased operations, received resignations from all

---

[8] Defendants were overdrawn in their accounts in the amount of $1,836,210.64.

3

members of Defendants' board of directors, and terminated all employees. When Defendants ceased operations on September 16, they had insufficient cash in their bank accounts and failed to pay the approximately 150 Union members for wages and benefits due for the employees' last week of work ending September 16, 2019.

On September 23, 2019, the Court appointed a Receiver over Defendants' assets. The Union filed a motion to intervene on March 11, 2020 and an amended motion on March 20, 2020. The Court orally granted the Union's motion to intervene on April 14, 2020, and issued a memorandum and order setting forth that ruling on April 17, 2020. The Union filed its Intervenor Complaint on April 28, 2020, asserting several claims and seeking a declaration that its claim for $137,955.11 in unpaid wages and benefits has priority over Bank Midwest's liens. Bank Midwest and the Union requested expedited briefing as to the Union's claim for declaratory judgment that it has priority over $137,955.11 in Defendants' assets.

## III.     Discussion

Both Bank Midwest and the Union assert that they have priority over $137,955.11 in Defendants' assets. This amount represents the unpaid wages and benefits that R.F. Fisher failed to pay its employees for the week ending on September 16, 2019. The Union asserts several arguments as to why it has priority over this money, while Bank Midwest contends that each of the Union's arguments fails and that its pre-filing lien and security interest takes priority over the Union's claim to $137,955.11 in Defendants' assets. The Court will address each argument asserted by the parties.

4

A.     **Receivership Order**

The Union first asserts that the Order Appointing Receiver ("Receivership Order") authorizes the Receiver to place employee wages over Bank Midwest's liens. The Union relies on section 4 of the Receivership Order which provides:

> 4. **Application of Proceeds**. The Receiver is hereby authorized to apply the rents, revenues, income, issues and profits collected by the Receiver in connection with the management, operation and liquidation of the Collateral: first, to the Receiver's compensation as identified above; second, to the other costs and expenses of the receivership, including any operating expenses, attorney fees and other out-of pocket expenses incurred by the Receiver in connection with the receivership; *third, to the costs of operating, maintaining and repairing the Collateral; fourth, to payment of expenses of the Collateral, including but not limited to payment of real and personal property taxes, insurance, water and sanitation bills, utilities and other operating expenses*; fifth, to repay all sums borrowed by the Receiver; sixth, whenever sufficient funds are available for such purpose, the Receiver shall make principal and interest payments toward the indebtedness of the Bank, and seventh to a fund to be held by the Receiver in an interest-bearing account, pending further order of this Court.[9]

The Union asserts that employee wages qualify as a cost of operating the Collateral, and that wages are therefore third in priority to be paid. Alternatively, the Union contends that employee wages qualify as a "payment of expenses of the Collateral" and are fourth in priority. Thus, the Union asserts that the Receivership Order establishes that employee wages are third or fourth in priority and given preference over repaying money owed to the bank, which is sixth in priority.

Bank Midwest asserts that the Union's argument is erroneous because it equates operational costs of Defendants' businesses with costs for operating the Collateral, and there is a fundamental difference between employment-related business expenses and expenses related to the Collateral. Furthermore, it asserts that it sought the appointment of the Receiver for the

---

[9] Doc. 11 at 8–9 (emphasis added).

purpose of protecting its lien. Thus, making employee wages a priority over its secured debts would run counter to the purpose of seeking a Receiver.

The term "Collateral" is defined in the Receivership Order, and the Court must therefore consider that definition when determining the meaning of Section 4.[10] The Receivership Order states that a receiver is appointed "over the real and personal Collateral of [D]efendants . . . as set forth on Exhibit A hereto and as defined in the complaint filed in this action (the "Collateral")."[11] Exhibit A of the Receivership Order sets forth a "List of Receivership Property" which includes "all assets of [Defendants]" and a list of items such as products, accounts, and proceeds.[12] The Complaint defines the "Collateral" as the Security Agreements that granted Bank Midwest liens on various assets due to Defendants' Notes with Bank Midwest.[13] Specifically, there are four Security Agreements and one mortgage, all dated June 30, 2015, listed as the Collateral.[14]

Employee wages cannot be considered a cost of operating the Collateral, *i.e.*, they cannot be considered a cost of operating the Security Agreements and mortgage or Defendants' assets. As Bank Midwest points out, the Union's argument conflates the operational costs of running Defendants' business with the costs of operating the Collateral. Furthermore, employee wages are not "payment of expenses of the Collateral."[15] In sum, there is no clear language in the Receivership Order authorizing preference to employee wages and benefits over the principal and interest payments toward Defendants' indebtedness to Bank Midwest. Thus, Section 4 of the

---

[10] The Court notes that although the parties discuss Section 4 of the Receivership Order, neither party specifically discusses the "Collateral" definition set forth in the Order.

[11] Doc. 11 at 1.

[12] *Id.* at 14. The complete list of Receivership Property is located on this page.

[13] Doc. 1 at 3, ¶10 (a)–(e).

[14] *Id.*

[15] Doc. 11 at 9.

Receivership Order does not prioritize the Union's claim to employee wages over Bank Midwest's liens.

The Union also asserts that Section 2(c)(xi) of the Receivership Order requires employee wages to be paid prior to Bank Midwest's liens. This section states that the Receiver may

> borrow from Bank, on such reasonable terms as may be mutually acceptable to Bank and the Receiver, funds to meet working capital needs of the Defendant's Business in excess of the income from the Collateral, such funds to be advanced under the Loan Documents to be added to the outstanding indebtedness of Borrowers pursuant to the Loan Documents, as Bank and the Receiver may mutually determine.[16]

Although the language provides that the Receiver may borrow from the Bank funds to meet the working capital needs of Defendants' business, this language does not indicate that the Receiver is authorized to borrow money to pay unpaid employee wages. Instead, it appears to authorize the Receiver to obtain funds to continue running Defendants' business or working capital needs should the business continue, which it did not. Thus, the Court concludes that this section does not authorize the payment of employee wages over Bank Midwest's liens. Accordingly, the Receivership Order does not grant the Union priority.

### B. Kansas Statutes

The Union next contends that several Kansas statutes require preference or priority to be given to employee wages over Bank Midwest's liens.

#### 1. K.S.A. § 44-312

The Union first asserts that K.S.A. § 44-312 establishes that employee wages are preferred over every other debt. This statute states:

> That whenever a receiver shall be appointed of the estate of any corporation, copartnership, or individual, under the laws of this state, or whenever any corporation, copartnership or individual shall make a general assignment for the

---

[16] *Id.* at 6.

> benefit of the creditors of such corporation, copartnership, or individual, the wages due to all laborers or employees other than officers of such corporation, accruing within the six months immediately preceding such appointment of a receiver or such assignment, shall be preferred to every other debt or claim against such corporation, copartnership, or individual, and shall be paid by the receiver or assignee of such corporation, copartnership or individual from the moneys thereof which shall first come into the hands of such receiver or assignee.

Bank Midwest argues that § 44-312 is inapplicable because it specifically requires the receiver to be appointed "under the laws of this state," and Bank Midwest commenced the receivership under federal law. The Union asserts that this state statute is applicable pursuant to 28 U.S.C. § 959(b), which provides that receivers

> appointed in any cause pending in any court of the United States . . . shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

The Court finds it unnecessary to determine whether § 44-312 is applicable to federal receiverships because even if it is applicable, this statute does not provide the Union with the relief it seeks in this case as explained below.

The plain language of the statute does not grant lien rights, but instead only discusses preference of debts. Indeed, Bank Midwest directs the Court to a Kansas Court of Appeals case interpreting § 44-312 that involves a factual scenario like the one present here. In *First National Bank of Medicine Lodge v. Family Medical Clinic of Medicine Lodge*, *Kan. P.A.*, a bank initiated a foreclosure action against a company on a promissory note secured by the company's receivables.[17] A receiver was appointed to collect on the accounts receivable, and the company's employees intervened to establish a claim on their wages and benefits.[18] The district court found that § 44-312 gave the employees a preferential claim for recovery of wages superior to the

---

[17] 798 P.2d 519 (Kan. Ct. App. 1990).
[18] *Id.* at 519.

8

bank's lien.[19] The Kansas Court of Appeals reversed finding that § 44-312 simply "creates a preference for wages due employees whenever a receiver is appointed of the estate of a corporation . . . but does not create a lien and does not give such wages priority over perfected security interests."[20] Thus, the court found that "the legislature intended only to allow wage claimants a preference over other general creditors and did not intend to give them priority over prior perfected consensual security interests" and therefore the court did not allow employees' wages to take priority over the bank's liens.[21]

The Union relies on § 44-312 to establish preference for its unpaid employee wages over Bank Midwest's security interests in the collateral. The Union attempts to distinguish *First National* from the facts here by noting that the parties and the court in *First National* did not consider the application of K.S.A. § 17-6910, a statute that addresses receivers for insolvent corporations. The Union contends that § 17-6910 complements § 44-312, and that the two statutes must be read together. The Court finds that K.S.A. § 17-6910 is separate from § 44-312 and will consider § 17-6910 below. In addition, in *First National*, the bank initiated a foreclosure action which resulted in a receivership, similar to the facts in this case. As explained by the Kansas Court of Appeals, the plain language of the statute does not give employee wages a lien or priority over secured liens.[22] Instead, it simply indicates a preference for wages over other general debts. Thus, this statute does not provide a basis to establish the Union's priority to $137,955.11 in unpaid employee wages over Bank Midwest's liens.

---

[19] *Id.* at 519–20.

[20] *Id*. at 519.

[21] *Id*. at 520; *see also Acme Foundry & Mach. Co. v. Wampler*, 260 P. 972, 973 (1927) (stating that § 44-312 "is a preference statute only, and not a lien statute").

[22] *First Nat'l Bank of Med. Lodge*, 798 P.2d at 520.

9

## 2. K.S.A. § 44-315

The Union briefly asserts that § 44-315 requires employers to pay employees' unearned wages ahead of other liens. This statute addresses damages for willful non-payment of employee wages when "an employer discharges an employee or whenever an employee quits or resigns."[23] It provides that the employer must pay the "employee's earned wages not later than the next regular payday," and that the failure to do so makes the employer liable for the wages due and a penalty.[24] Other than stating what the statute provides, the Union does not address how the statute is applicable in this case and offers no discussion as to why this statute would give it priority over Bank Midwest's liens as to $137,955.11. Indeed, there is nothing in this statute establishing any priority, or even preference, as to wages over liens. Thus, the Court concludes that this statute is inapplicable.

## 3. K.S.A. § 17-6910

The Union also asserts that K.S.A. § 17-6910 grants a lien for unpaid wages that takes priority over Bank Midwest's liens. That statute provides:

> Whenever any corporation of this state, or any foreign corporation doing business in this state, shall become insolvent, the employees doing labor or service of whatever character in the regular employ of the corporation, shall have a lien upon the assets thereof for the amount of the wages due to them, not exceeding two months' wages, respectively, which shall be paid prior to any debt or debts of the corporation. The word "employee" as used in this section shall not be construed to include any of the officers of the corporation.

The plain language of the statute states that employees will have a lien upon the *assets* if the corporation becomes insolvent "for the amount of the wages due to them." It also provides that the lien shall be paid prior to any *debts* of the corporation. The question, then, is whether

---

[23] K.S.A. § 44-315(a).

[24] K.S.A. § 44-315(a)–(b).

10

Defendants' assets are subject to existing liens or whether such existing liens are included in the debts of the corporation.

The Union contends that the broad and expansive language of "prior to any debt or debts of the corporation" must be interpreted to include liens, like the ones Bank Midwest holds.  Bank Midwest asserts that although § 17-6910 contains the word "lien," it does not provide that any lien for wages should have priority over secured liens.  Bank Midwest further states that the employees' wage lien is on the assets, and assets are subject to the pre-existing liens.  Bank Midwest draws support for its position by relying on a case from Delaware, *Clough v. Superior Equipment Corp.*, in which the Delaware Chancery Court interpreted a similarly worded statute.[25]

In *Clough*, a corporation's real estate was encumbered by a mortgage, and a receiver was appointed when the corporation became insolvent.[26]  The sale of the real estate brought in less money than the amount due on the mortgage, and a dispute arose between the wage claimants and the execution creditors who had liens on the property as to which party had priority to the proceeds of the sale.[27]  The court examined the Delaware statute which stated:

> Whenever any corporation formed under the provisions of this Chapter, or any foreign corporation doing business in this States, shall become insolvent, the employees doing labor or service of whatever character in the regular employ of such corporation, shall have a lien upon the assets thereof for the amount of the wages due to them, not exceeding two months' wages respectively, which shall be paid prior to any other debt or debts of said corporation; but the word 'employee' shall not be construed to include any of the officers of such corporation.[28]

---

[25] 156 A. 249 (Del. Ch. 1931).

[26] *Id.*

[27] *Id.* at 250.

[28] *Id.* (citing 36 Del. Laws, chapter 137, Sec. 57).  The Court notes that the wording of this Delaware statute is almost identical to K.S.A. § 17-1690.

The court first noted that "[a] debt, it may be said, remains a debt notwithstanding it may be secured by a lien and so, it may be argued, that in placing the wages ahead of all other debts, the statute puts the wages ahead of lien-secured debts as well as others."[29] The court found, however, that "such cannot be the meaning of the statute."[30] Although the statute gave a lien to the wage claimants, the use of the word "assets" in the statute indicated that the "assets" consisted of the "the property of the corporation subject to the liens then existing upon it."[31] Thus, the court found that the wage claimants' lien would be against those assets, and the wage claimants were only entitled to the proceeds that remained after the mortgage debt and prior existing liens were satisfied.[32]

The Union points out that *Clough* was decided in 1931 and relied on several cases decided in New Jersey prior to 1900. In addition, the Union asserts that a New Jersey case, *Long v. Republic Varnish Enamel & Lacquer Co.*,[33] decided three years after *Clough*, clarifies the purpose of language very similar to the language found in K.S.A. § 17-6910. The Court, however, finds *Long* to be distinguishable and inapplicable here. First, the New Jersey statute at issue in *Long* is similar but not identical to either the Delaware statute or K.S.A. § 17-6910, which are almost identical to each other. Instead, the New Jersey statute contains different language giving "a first and prior lien upon the assets thereof for the amount of wages due."[34] Second, the *Long* court did not discuss the *Clough* case or the Delaware statute. Finally, the

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 250–51 (noting that "[i]nasmuch as the proceeds from the realty are insufficient to discharge the mortgage debt, the wage claimants cannot receive anything from that source as a preference under [the Delaware statute].").

[33] 169 A. 860 (N.J. 1934).

[34] *Id.* at 861 (citing Section 83 of the General Corporation Act).

12

court in *Long* opines on legislative intent and does not directly answer the question of whether a wage claimant's lien takes priority over prior existing liens.[35] The Court is not inclined to rely on another court's analysis of the legislative intent, behind a differently worded statute from a different state, to interpret the plain language of § 17-6910 or what the Kansas legislature intended when enacting § 17-6910.

Furthermore, the Court has considered statutory lien language in other Kansas statutes and concludes that the Kansas legislature would have included language in § 17-6910 clearly indicating that the lien took preference over other liens or security interests if that had been its intent. For example, K.S.A. § 58-218 provides for a lien for seeding and baling hay and specifically states that such lien "shall be preferred to that of any prior security interest or encumbrance."[36] K.S.A. § 55-207 provides for an oil and gas lien and states that "such lien shall be preferred to all other liens." Although this language establishes a preference over other liens, the Kansas Court of Appeals concluded that this language "expressly subordinated [the lien] to prior perfected security interests."[37]

The statute at issue here, K.S.A. § 17-6910, states that employees will have a lien for wages on assets that shall be paid prior to any debt or debts of the corporation. It does not provide that the lien shall take priority over other liens. Nor does it provide that the lien will take priority over secured interests. Thus, there is no clear language in the statute stating that this lien has priority over other liens. In addition, the Court finds the reasoning in *Clough* that the word

---

[35] *Id.*

[36] *See also* K.S.A. § 58-203 (providing a lien for threshing and husking and stating that "[s]uch lien shall be preferred to that of any prior security interest or encumbrance").

[37] *First Nat'l Bank of Med. Lodge v. Fam. Med. Clinic of Med. Lodge*, *Kan. P.A.*, 798 P.2d 519, 520 (Kan. Ct. App. 1990); *see also* K.S.A. § 55-214 (providing for a transporter's lien and stating that it "shall not be prior to any valid and existing perfected security interest").

"assets" includes "the property of the corporation subject to the liens then existing upon it" persuasive.[38]

Here, the parties agree that at the time of the Receivership, Bank Midwest possessed a lien secured by all of Defendants' assets. Accordingly, Bank Midwest had a pre-existing secured lien at the time of the Receivership and Defendants' insolvency. Although the plain language of § 17-6910 grants employees a lien on the corporation's assets for wages dues to them, it does not provide that this lien takes priority over existing and prior liens on those assets. Accordingly, the Court finds that § 17-6910 does not establish the Union's claim to $137,955.11 over Bank Midwest's prior liens and secured interests.

### C. Equity

Finally, the Union asserts that the Court's equitable powers allow it to find that the Union's wage claims have priority. Bank Midwest contends that the Court cannot disregard the law.

"A district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."[39] This power, however, does not allow the court "to disregard the law in its entirety."[40] For one, a court of equity cannot change the terms of a contract without evidence of fraud, accident, or mistake.[41] Furthermore, it is well established that "a 'receiver appointed by a federal court takes property subject to all liens, priorities or privileges existing or accruing under the laws of the State.'"[42] "Another well established principle of receiverships is

---

[38] *Clough*, 156 A. at 250.

[39] *SEC v. Mgmt. Sols., Inc.*, No. 11-CV-01165-BSJ, 2013 WL 594738, at *2 (D. Utah Feb. 15, 2013) (citing *SEC v. Elliott*, 953 F.2d 1560, 1569–70 (11th Cir. 1992)).

[40] *Id.* at *3.

[41] *Id.* (citing *Hedges v. Dixon Cnty.*, 150 U.S. 182, 189 (1893)).

[42] *Id.* (citing *Marshall v. New York*, 254 U.S. 380, 385 (1920)).

that 'a receiver holds the property coming into his hands by the same right and title as the person for whose property he is receiver, subject to liens, priorities, and equities existing at the time of his appointment."[43]  "[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principal of equality of distribution."[44]  Thus, although the Court "has broad powers to craft an equitable remedy in the distribution of receivership assets . . . it cannot ignore state and federal laws."[45]  "In particular, [the] Court must respect contract rights, the status of secured creditors, and secured creditors' rights to their interests in collateral."[46]

In this case, Defendants were indebted to Bank Midwest under five promissory Notes that were secured by Security Agreements.  These Security Agreements granted Bank Midwest liens on various assets.  Bank Midwest also perfected its security interest in the collateral by filing UCC-1 statements.  Defendants subsequently defaulted on the Notes and Security Agreements.  Accordingly, Bank Midwest had existing liens and security interests at the time of the Receivership.   Neither the Receivership Order nor Kansas statutes establish that the Union's wage claims take priority over Bank Midwest's prior existing liens and security interests.  Thus, the Court cannot grant to the Union in equity what was not granted in law or by contract.  !

**IT IS THEREFORE ORDERED BY THE COURT** that Bank Midwest's Declaratory Motion for Lien Priority, entitled "Brief in Support of Plaintiff's Lien Priority and in Opposition to Claim of Lien Priority Filed by International Brotherhood of Electrical Workers Local 124" (Doc. 51) is granted.

---

[43] *Id.* (citing *Cates v. Musgrove Petroleum Corp., Inc.*, 376 P.2d 819, 821 (Kan. 1962)).

[44] *Id.* (citing *Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938)).

[45] *Id.* at *4.

[46] *Id.*

**IT IS FURTHER ORDERED BY THE COURT** that the Union's Motion for Declaratory Judgment, entitled "Intervenor Plaintiff's Brief in Support of Declaratory Relief" (Doc. 52) is denied.  Although the Union has a claim to the $137,955.11 in unpaid wages, this claim does not take priority over Bank Midwest's prior existing liens.   Thus, the Court cannot grant declaratory judgment in the Union's favor.

**IT IS SO ORDERED.**

Dated: January 25, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE
