IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BANK MIDWEST, a Division of NBH Bank,<br><br>  Plaintiff,<br><br>  v.<br><br>R.F. FISHER ELECTRIC COMPANY, LLC, *et al.*,<br><br>  Defendants. | Case No. 19-CV-2560-JAR-GEB |
| MICHAEL L. STAHELI,<br>**Receiver Over the Real and Personal Collateral of R.F. Fisher Holdings, Inc., and G&G Leasing, LLC,**<br><br>  Third-Party Plaintiff,<br><br>  v.<br><br>LOCAL UNION NO. 124 I.B.E.W. PENSION TRUST FUND, et al.,<br><br>  Third-Party Defendants. | |

## MEMORANDUM AND ORDER

Plaintiff Bank Midwest, a division of NBH Bank ("Bank Midwest"), filed suit against Defendants R.F. Fisher Electric Company, LLC; R.F. Fisher Holdings; and G & G Leasing due to their default on loans from Bank Midwest. Plaintiff also sought the emergency appointment of a Receiver, and Michael L. Staheli ("Receiver"), was appointed in September 2019. In January 2022, the Receiver filed a Third-Party Complaint against seven third-party Defendant trust funds (collectively "the Funds") asserting conversion and tortious interference with contract claims. The Funds have filed a Motion to Dismiss (Doc. 128) asserting that the Court should

dismiss the complaint against them because the claims are preempted by the Employee Retirement Income Security Act ("ERISA") and the Labor Management Relations Act ("LMRA"). The Receiver disagrees. The matter is fully briefed, and the Court is prepared to rule. For the reasons stated in detail below, the Court grants the Funds' motion.

**I.      Legal Standard**

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level"[1] and must include "enough facts to state a claim to relief that is plausible on its face."[2] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[3] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but it requires more than "a sheer possibility."[4] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[5] Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[6]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the Court "must take all of the factual allegations in the complaint as true,

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 235–36 (3d ed. 2004)).

[2] *Id*. at 570.

[3] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[5] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[6] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[but it is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[7] Thus, the Court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[8] Second, the Court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[9] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]

## II.     Factual and Procedural Background

On September 16, 2019, R.F. Fisher Electric Co., LLC ("R.F. Fisher"), an electrical contractor, ceased its operations. That same day, Bank Midwest filed suit against Defendant R.F. Fisher pursuant to notes, security agreements, and a guaranty due to R.F. Fisher's default on the loan agreements.[11] At the time Bank Midwest filed its lawsuit, R.F. Fisher was indebted to the bank for a total of approximately $11 million. Pursuant to Bank Midwest's emergency motion for a receiver, the Receiver was appointed over R.F. Fisher's real and personal collateral on September 23, 2019.[12]

Over the past three years, there have been various disputes regarding who has priority to different funds. R.F. Fisher was a signatory and party to a collective bargaining agreement ("CBA") with the International Brotherhood of Electrical Workers Local Union No. 124 (the

---

[7] *Id*. (quoting *Twombly*, 550 U.S. at 555).

[8] *Id.* at 678–79.

[9] *Id*. at 679.

[10] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

[11] The Court only references R.F. Fisher but notes that R.F. Fisher Holdings and G & G Leasing are also Defendants in the case.

[12] Doc. 11.  The Court will discuss relevant language from the Order of Appointment later in this Order.


"Union"). In April 2020, the Union filed an intervenor complaint against Defendants asserting several claims, and seeking in part, a declaratory judgment that its claim to $137,955.11 in unpaid wages and benefits took priority to Bank Midwest's claims. Both Bank Midwest and the Union filed motions asserting that each had a priority interest in these funds. This Court found that although the Union had a claim to $137,955.11 in unpaid wages, the Union's claim did not take priority over Bank Midwest's prior existing liens.[13]

The Receiver also filed counterclaims against the Union for conversion, tortious interference with contract, and a claim for enforcement of the Order of Appointment. The Union filed a motion to dismiss, and the Court found that the Receiver adequately asserted claims for conversion and tortious interference with contract but failed to assert a claim for enforcement of the appointment order.[14] The Union and the Receiver subsequently settled all claims between them. As of December 2021, all claims and parties to the action had been resolved.

In January 2022, after receiving leave from the Court, the Receiver filed a third-party complaint against seven Defendants: (1) Local Union No. 124 I.B.E.W. Pension Trust Fund, (2) Local Union No. 124 I.B.E.W. – N.E.C.A. Annuity and 401(K) Trust Fund, (3) I.B.E.W. Local Union No. 124 Health and Welfare Fund, (4) I.B.E.W. Local Union No. 124 Vacation and Holiday Trust Fund, (5) Electrical Joint Apprenticeship and Training Trust Fund, (6) National Electrical Benefit Fund, and (7) Labor Management Cooperation Trust. These Defendants are trust funds located in Kansas City, Missouri. The Funds are multiemployer employee benefit plans that provide retirement, healthcare, apprenticeship, and other benefits to eligible

---

[13] Doc. 63.
[14] Doc. 101.

participants who are employees of contributing employers. These employee benefit plans are managed by Boards of Trustees, and the Trustees are fiduciaries of the Funds.

Pursuant to R.F. Fisher's CBA with the Union, R.F. Fisher was obligated to make fringe benefit contributions to the Funds based upon a set hourly package. The Funds received and managed contributions by R.F. Fisher on behalf of R.F. Fisher's employees. R.F. Fisher employees performed work on contracts between R.F. Fisher and customers, such as Citadel Electric Group ("Citadel"), J.E. Dunn Construction Company ("J.E. Dunn"), and Kelly Construction Group, LLC ("Kelly Construction"). The contractually agreed amounts owed to R.F. Fisher by these customers included costs for labor and fringe benefits by R.F. Fisher's employees who were union members. At the time of the Receiver's appointment, the accounts receivable on R.F. Fisher's books and records showed customer obligations owed to R.F. Fisher for work that was performed under these contracts. The Funds knew of the contractual relationships between R.F. Fisher and Citadel, J.E. Dunn, and Kelly Construction.

During the receivership, the Funds contacted one or more of R.F. Fisher's former customers and obtained payments directly from these customers, stating that the amounts were owed to the Funds for fringe benefits owed to R.F. Fisher employees. The total amount received by the Funds is at least $325,997.96, which includes $254,89.41 from Citadel, $53,828.43 from J.E. Dunn, and $17,271.12 from Kelly Construction.[15]

---

[15] The Court notes that the Receiver also alleges that in 2020, the Funds and the Union filed a complaint against R.F Fisher in the Western District of Missouri. On October 23, 2020, they obtained an amended default judgment against R.F. Fisher in the amount of $1,001,853.13. The Receiver alleges that the judgment is a general unsecured claim against R.F. Fisher and that the Funds presumably applied the money they received from Citadel, J.E. Dunn, and Kelly Construction toward the judgment they obtained against R.F. Fisher.

The Receiver asserts claims for conversion and tortious interference with contract against the Funds.  He claims that the Funds obtained $325,997.96 from Citadel, J.E. Dunn, and Kelly Construction either through tortious interference with contract or conversion.  The Receiver asserts that these receivables belonged to R.F. Fisher and should have gone to R.F. Fisher instead of to the Funds.  The Funds have now filed a Motion to Dismiss and seek dismissal of these claims.

## III.     Discussion

The parties view the dispute, and the money ultimately at issue, vastly differently.  The Funds define the money at issue as "fringe benefit contributions," and they contend that the conduct at issue is them exercising their fiduciary obligations to enforce and collect R.F. Fisher's requisite fringe benefit obligations pursuant to the CBA.  They assert that the Receiver fails to state a claim because ERISA preempts the Receiver's claims for conversion and tortious interference with contract.  In addition, they contend that the LMRA preempts the Receiver's claim because resolution of the Receiver's claims requires an interpretation of the CBA between R.F. Fisher and the Union.

The Receiver defines the money at issue as "diverted Fisher receivables."  He asserts that ERISA, the LMRA, and the CBA's provisions do not apply to the Receiver or to the Receiver's claims against the Funds.  He primarily contends that he has adequately pleaded claims for conversion and tortious interference with contract, asserting that the Funds improperly received money from R.F. Fisher's contractors, in contravention to the Receiver's right to that money pursuant to the Order of Appointment.

The Court must first determine whether ERISA is applicable.[16] The Receiver argues that it is not. He contends that he was not appointed as receiver for R.F. Fisher (the entity) or as R.F. Fisher's agent in any capacity. Instead, the Receiver states that he was only appointed over the real and personal collateral of R.F. Fisher. Thus, he contends that he is not bound by any statutory provisions that may have applied to R.F. Fisher.

Although the Order of Appointment gives the Receiver the right to "manage, operate, protect and liquidate the Collateral,"[17] it does not give the Receiver unlimited powers or more rights than R.F. Fisher would have had in the Collateral. The Appointment Order specifically provides that "[t]he appointment of the Receiver shall not be deemed a 'change in control' or 'change in ownership' of [R.F. Fisher] under any contracts, . . . or other matters relating to the operations of [R.F. Fisher's] Business."[18] It also provides that "[t]he Receiver is authorized and empowered to exercise all the powers and rights permitted by law."[19] The Order of Appointment also does not give the Receiver the powers or ability to collect property or collateral not related to R.F. Fisher.

Here, the Receiver is attempting to obtain what he contends is R.F. Fisher's property. The Receiver can only obtain the property if R.F. Fisher would have a right to it, and he cannot obtain what R.F. Fisher would not have rightful ownership of. Thus, although the Receiver may not be the agent of R.F. Fisher and may not be acting on behalf of R.F. Fisher, the Receiver is

---

[16] The Court notes that the Funds also assert that the Receiver fails to plead appropriate subject matter jurisdiction because the Receiver referenced 28 U.S.C. § 1362 in his Complaint. The Receiver asserts that this was a typographical error, and he intended to rely on § 1367. Section 1367 provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Here, the Receiver's claims relate to the receivership that has been proceeding in this Court for three years. Thus, the Court has subject matter jurisdiction.

[17] Doc. 11, Order of Appointment, at 3 ¶ 2(c).

[18] *Id.* at 2 ¶ 2(a).

[19] *Id.*

7

still constricted by R.F. Fisher's ability to obtain, and R.F. Fisher's right, to the property.[20] And if the accounts receivable is related to, or governed by ERISA law, ERISA would be applicable. Accordingly, the Court must determine the scope of the Receiver's claims and whether they are preempted by ERISA.

ERISA contains a broad preemption provision providing that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[21] There are two types of ERISA preemption: complete preemption and conflict preemption. Under the doctrine of complete preemption, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive."[22] As to conflict preemption, "ERISA preempts state laws that 'relate to' employee benefit plans."[23] Although the Funds state general preemption principles, they do not specifically address the four categories of state laws identified by the Tenth Circuit that are conflict preempted by ERISA.[24] The Receiver does not discuss the test because he contends that ERISA is completely inapplicable to him.

---

[20] Put in a different context, if accounts receivable were not owed to R.F. Fisher, but were instead owed to another business, the Receiver could not obtain them. The Receiver must have some right to the property, and the Receiver's rights and powers are circumscribed and governed by R.F. Fisher's limitations and rights.

[21] *Ellis v. Liberty Life Assur. Co.*, 958 F.3d 1271, 1278 (10th Cir. 2020) (citing 29 U.S.C. § 1144(a)).

[22] *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

[23] *Pacificare of Okla. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995) (citing 29 U.S.C. § 1144(a)).

[24] The Funds proceed on the theory that the gravamen of the Receiver's third-party complaint is that the fringe benefit contributions were improper under the law and should be returned. They contend that § 403(c)(2) under ERISA is the statute that the Receiver must proceed under to obtain the improper contributions, and thus the Receiver's state law claims are completely preempted by this ERISA provision. Thus, it appears that the Funds may be relying on complete preemption as a defense. The Receiver does not address this contention.

Section 403(c)(2) provides that if "a contribution or payment is made by an employer to a multiemployer plan by a mistake of fact or law . . . paragraph (1) shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake." 29 U.S.C. § 1103(c)(2)(A)(ii). Here, there are no allegations that an employer made a contribution by a mistake of fact or law. Instead, the Receiver alleges conversion and tortious interference claims. However, to the extent that the Receiver attempts to obtain an improper contribution to the plan, ERISA would completely preempt his state law claims, and he would be required to proceed under § 403(c)(2).

"A court must analyze whether the state statutory or common law actions asserted in the plaintiff's complaint 'relate to' an employee benefit plan and therefore fall under ERISA's express pre-emption clause."[25]  "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or references to such a plan."[26]  Although there is no simple test to determine when a law "relates to" a plan, the Tenth Circuit has identified four categories:

> First, laws that regulate the type of benefits or terms of ERISA plans.  Second, laws that create reporting, disclosure, funding, or vesting requirements for ERISA plans.  Third, laws that provide rules for the calculation of the amount of benefits to be paid under ERISA plans.  Fourth, laws and common-law rules that provide remedies for misconduct growing out of the administration of the ERISA plan.[27]

Only one category could conceivably be applicable in this case, i.e, "laws and common-law rules that provide remedies for misconduct growing out of the administration of the ERISA plan."[28]  Thus, if the Receiver's claims rely on laws that provide him a remedy for the Funds' misconduct in administering the ERISA plan, ERISA would preempt the Receiver's state law claims.

Here, the Receiver alleges that the Funds contacted one or more of R.F. Fisher's former customers and obtained payments directly from these customers, stating that the amounts were owed to the Funds for fringe benefits owed to R.F. Fisher employees.  Thus, the allegations provide that the Funds were collecting fringe benefits on behalf of R.F. Fisher's employees.

---

[25] *Cannon v. Grp. Health Serv. of Okla., Inc.*, 77 F.3d 1270, 1273 (10th Cir. 1996) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)).

[26] *Shaw v. Delta Air Lines*, 463 U.S. 85, 96–97 (1983).

[27] *Pacificare of Okla.*, 59 F.3d at 154 (quoting *Airparts Co. v. Custom Benefit Servs. of Austin, Inc.*, 28 F.3d 1062, 1064–65 (10th Cir. 1994)).

[28] *Id.*

Therefore, the Receiver's state law claims—conversion and tortious interference with contract—are based on the Funds' alleged misconduct in collecting the benefits. Accordingly, the Receiver's claim "relates to" an employee benefit plan and would fall under ERISA's preemption provision.

In addition, the Funds direct the Court's attention to a District of New Mexico case in which the court found that several state law claims, including claims for intentional interference with business relations, intentional interference with prospective business relations, and defamation, were preempted by ERISA.[29] In that case, the plaintiffs were trustees of three multiemployer ERISA employee benefit plans and brought suit against the defendant employer for failure to pay its required contributions to the trust funds.[30] The defendant filed counterclaims against the plaintiffs alleging that the plaintiffs sent notices to the defendant's business clients stating that the defendant was delinquent in its contributions and requesting that the sums be paid directly to the plaintiffs.[31] The plaintiffs moved to dismiss the defendant's counterclaims asserting that the claims were preempted by ERISA.[32]

The District of New Mexico noted Tenth Circuit law for conflict preemption under ERISA and determined that the defendant's state law claims could "be described as 'common-law rules that provide remedies for misconduct growing out of the administration of the ERISA plan.'"[33] The court then determined:

---

[29] *Trustees of Sheet Metal Workers Loc. Union 49 Fam. Health Plan v. Mares Plumbing & Mech., Inc.*, No. CV 11-898 JCH/CG, 2012 WL 3599531, at *6–7 (D.N.M. May 31, 2012). There were two additional claims for fraud and violation of the New Mexico Unfair Practices Act. *Id.* at *2.

[30] *Id.* at *2.

[31] *Id.*

[32] *Id.* at *6.

[33] *Id.* (citing *Pacificare of Okla., Inc. v. Burrage*, 59 F.3d 151, 154 (10th Cir. 1995)).

> All of the counterclaims are based on actions taken by Plaintiffs in an attempt to administer the Trust Funds, i.e. recover the delinquent contributions by sending out deficiency notices to Defendant's business clients. By challenging the propriety of the deficiency notices, Defendant would have the court find that Plaintiffs committed misconduct in their administration of the Trust Funds. This creates the type of causal connection between the state law claim and the substantive administration of the benefit plan that ERISA's conflict preemption was meant to avoid.[34]

The court found that the defendant's counterclaims "related to" the trust funds because they were based on the trustees' actions in administering the plan and enforcing the defendant's contribution requirements.[35] Due to ERISA's broad preemption clause, the District of New Mexico concluded that the counterclaims were preempted by ERISA and dismissed them.[36] In this case, the facts are similar because the Receiver's claims relate to the Funds' actions in administering and collecting R.F. Fisher's fringe benefit contributions.

Furthermore, the Receiver's remedy appears to be removal of the benefits from the plan, which would presumably implicate the exclusive benefit rule.[37] "A cardinal principle of ERISA is that the assets of a pension plan shall be held for the exclusive purpose of providing benefits to participants and their beneficiaries."[38] In addition, "the exclusive benefit rule is violated if there has been a removal of plan assets for the benefit of the plan sponsor or anyone other than the plan participants."[39] In at least one case, the Tenth Circuit determined that the exclusive benefit rule is applicable to a receiver of an insolvent employer.[40]

---

[34] *Id.* (citations omitted).

[35] *Id.* at *7.

[36] *Id.*

[37] As noted above, if the Receiver seeks the return of funds under § 403(c)(2), his remedy would also be governed and preempted by ERISA law.

[38] *Resol. Tr. Corp. v. Fin. Insts. Ret. Fund*, 71 F.3d 1553, 1557 (10th Cir. 1995).

[39] *Id.* (internal quotation marks and citations omitted).

[40] *Id.* at 1556–58.

Here, there are no allegations in the complaint of removal of plan assets to the detriment of the plan participants. However, to the extent the Receiver's claims for tortious interference and conversion seek the *remedy* of obtaining—or removing—the money from the plan, ERISA would prohibit the removal of plan assets for the benefit of anyone other than the plan participant. As noted above, the Receiver alleges that the Funds wrongfully obtained fringe benefits from R.F. Fisher's customers. If these benefits have been placed in the plan, the benefits would belong to the plan, and the Receiver could not remove them without violating the exclusive benefit rule.

In sum, the Receiver's claims are conflicted preempted by ERISA. Furthermore, to the extent that the Receiver's remedy involves the removal of plan assets, ERISA is applicable and preempts the Receiver's claims. Accordingly, the Receiver's claims are preempted by ERISA and must be dismissed.[41]

**IT IS THEREFORE ORDERED BY THE COURT** that Third-Party Defendants' Motion to Dismiss (Doc. 128) is **granted**.

**IT IS SO ORDERED.**

Dated: October 26, 2022

<div style="text-align:right">

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

</div>

---

[41] Because the Court concludes that ERISA preempts the Receiver's claims, it need not address the Funds' alternative arguments.